Ethel E. Shaver, Appellee, v. Richard O. Brierton, Appellant.

Gen. No. 10,717.

Opinion filed January 28, 1954.
Released for publication February 15, 1954.

ELWIN S. WADSWORTH, of Dixon, for appellant.

WARNER & WARNER, of Dixon, for appellee; HENRY C. WARNER, and WARREN H. BADGER, both of Dixon, of counsel.

MR. JUSTICE DOVE delivered the opinion of the court.

This action was commenced in a justice of the peace court by Ethel E. Shaver against her brother, Richard O. Brierton, by which she sought to recover a judgment for one-third of the value of services rendered by her in the care and maintenance of her mother and for money expended by her for the benefit of her mother from February 4, 1950 to January 10, 1951. Upon an appeal to the circuit court of Lee county a trial was

had before a jury resulting in a verdict in favor of the plaintiff and against the defendant for $350. After a motion for a new trial had been denied the trial court rendered judgment on the verdict and the record is before this court for review upon an appeal by the defendant.

The evidence discloses that the father of the parties died in 1927 leaving him surviving, his wife, Ella Brierton and four children. One of the children, Mrs. Eberly, died in 1945. The other children were Sylvester Brierton, Ethel E. Shaver, the plaintiff, and Richard O. Brierton, the defendant. The mother received no part of the estate of her husband, but each child received approximately $10,000.

After the death of her husband, Ella Brierton made her home with her children spending approximately fifteen years at the home of the plaintiff, seven years at the home of Mrs. Eberly, and about six months at the home of the defendant. On May 7, 1946, she left the home of her son, Richard, and came to the home of the plaintiff and continued to make that her home until January 10, 1951, when she was removed to a hospital and from there to a nursing home where she died on July 10, 1952.

While at the home of the plaintiff and on February 4, 1950, Mrs. Brierton suffered a stroke and thereafter was practically helpless. During the ensuing forty-eight and one-half weeks, that is—from February 4, 1950, to January 10, 1951, Mrs. Brierton remained in plaintiff's home and was cared for and maintained by the plaintiff or by persons employed and paid by the plaintiff, and in this proceeding plaintiff seeks to recover from her brother one-third of the value of her services to her mother for the forty-eight and one-half week period from February 4, 1950, to January 10, 1951, together with one-third of $27 paid by plaintiff to a Mrs. Rhodes for nursing services. The care of the

194

mother from May 7, 1946, to February 4, 1950, or the medical, hospital and nursing expense of the mother between January 10, 1951, and July 22, 1952, are not involved in this proceeding.

It is not contended by appellant that the plaintiff did not support, care for, nurse, and maintain his mother in the home of the plaintiff during the forty-eight and one-half week period involved in this proceeding, or that he is not financially able to contribute to her support, or that the plaintiff ever received any compensation for the services she rendered his mother, nor does appellant insist that the judgment is excessive. It is the contention of his counsel, however, that no legal obligation is imposed by the statute of this State upon the defendant to contribute to the plaintiff for the support of his mother during this period; that such services as plaintiff rendered her mother are presumed to be gratuitous, and that the evidence discloses that the plaintiff made no request upon the defendant for payment of any services rendered her mother while the mother was in plaintiff's home, and that plaintiff's claim was created after the services were performed.

■ At common law an adult child is under no duty or obligation to contribute to the support of his parents. Whatever duty rests upon him in this respect must be based on either contract or statute (39 Am. Jur., p. 711, Parent and Child, sec. 70). In *People v. Hill,* 163 Ill. 186, 46 N. E. 796, 36 L. R. A. 634, the court (p. 189), after stating that the common law required parents to support their offspring until they attain the age of maturity, went on to say: "Nor does any common law obligation impose upon a child the legal duty of maintaining an infirm, aged or destitute parent."

The Public Assistance Code of Illinois provides, in substance, that every person who shall be in need and unable to earn a livelihood in consequence of any unavoidable cause shall be supported by his father,

mother, children, brothers or sisters if they, or either of them, are of sufficient ability; that the children or parents, as the case may be, of such person shall first be called upon for such support. This Code directs the state's attorney of the county in which the needy person resides to file suit against the persons responsible for the support and provides that the court may order the payment of adequate support money as may be just and equitable and against any or all the defendants and may be based upon the proportionate ability of each defendant to contribute to such support. The statute further provides that such orders may be enforced against the person of the defendant or defendants by attachment as for contempt and, in addition, by execution (Ill. Rev. Stats. 1953, chap. 23, Pub. Assistance Code, Art. IV, sec. 439—2 [Jones Ill. Stats. Ann. 18.204–2]). Section 12 of Article I of the same Code [Ill. Rev. Stats. 1953, ch. 23, § 436—12; Jones Ill. Stats. Ann. 18.201–12], after providing that every person who shall be in need and unable to earn a livelihood in consequence of any unavoidable cause shall be supported by his parents, children, brothers or sisters, designates such persons as "responsible relatives" if they "individually or together in any combination have sufficient income or other resources to support in whole or in part the needy person."

*Wyman v. Passmore,* 146 Iowa 486, 125 N. W. 213, 27 L. R. A. (NS) 683, was an action brought by a sister against her brother to recover for services rendered by the sister to the mother of the parties for a period of about five years. From the complaint it appeared that the plaintiff had five brothers and sisters. In affirming the judgment of the trial court, which overruled a demurrer of the defendant to the fourth count of the complaint which sought a recovery on a *quantum meruit* basis, the court said: "There can be no doubt of the proposition that, where one of several children

196

undertakes to keep the parent at the request of others, those at whose request the service is performed are under obligation to make reasonable compensation."

In the instant case, the plaintiff testified that about the middle of March 1950, which was less than six weeks after the mother had suffered a stroke and was rendered helpless, plaintiff, accompanied by her husband, went to the farm home of the defendant and there had a conversation with him in which she told him that their mother was very sick and needed so much care and asked him to contribute to her support. Her testimony is that he answered and said he would think about it. As abstracted, her testimony continued: "I asked him for funds to help pay the expenses of mother. I did not talk about expenses at the hospital but about expenses at my home. . . . I didn't ask him to pay me for taking care of my mother. I asked him to pay his share of the expenses. The expenses I was talking about were nursing bill, doctor bill, all the bills connected with her personally. I did not name any expenses at that time. I didn't name any amount to him at that time. I did not give him any idea how much money I was asking for. I didn't know myself then. . . . I asked him to contribute to her support and he said he would think about it."

Defendant, when called as an adverse witness by the plaintiff in answer to the question "Did Ethel Shaver come to your house in 1950 and talk about the care of your mother?" replied, "No, she wanted to take her to the nursing home."; and in answer to the following question, "Did she say anything about wanting you to share in care of your mother?" answered, "No, she didn't." Upon his direct examination in answer to the question "Did you ever have a conversation with your sister in relation to payment of any expenses of your mother while she lived with your sister?" replied, "No, I didn't, not until when she was in the nursing home."

Later, however, he testified that he did have a conversation with his sister at his farm while his mother was still there but stated that his sister did not ask for any contribution for taking care of his mother and that he never had any conversation with his sister in relation to paying for his mother's support while she stayed in his sister's home.

██ It is true that a person cannot claim the right to keep a relative and charge his or her support partly or wholly to another, but where there are two children equally liable and of sufficient financial ability and one supports while the other refuses, the one supporting may recover contribution from the other refusing (21 R. C. L., p. 726, sec. 29).

It is true, as counsel for appellant state, the parties hereto never came to any express agreement for the payment by defendant to the plaintiff for plaintiff's time and services which she devoted to the care of her mother, and it is true that the record does not disclose that defendant requested his sister to render his mother the services she did. The plaintiff testified, however, that when her mother came to her home the last time, which was May 7, 1946, she did so after "he (the defendant) told her she had to move." The evidence is that defendant did not visit his mother after she suffered the stroke, but less than six weeks thereafter the plaintiff went to the home of the defendant and told him of the serious illness of his mother and asked him to share her maintenance and to contribute to her support, and the only reply he made was that he would think about it. The evidence is that he never contributed anything, so his conduct was equivalent to a refusal. There is no evidence as to the amount expended by the plaintiff except the payment of $27 to Mrs. Rhodes, although the plaintiff did testify that she spent additional sums and it appears that she furnished a room in her home for her mother and all the food that

was consumed, prepared it, and, as one witness testi-fied: "She (Mrs. Brierton) couldn't have had better care than her daughter gave her. Mrs. Shaver fed her. At times when she was a little bit better her daughter would get her up and dress her. In a few minutes she would have to go back to bed. She was always clean. There was a bathroom in the room at the foot of the bed. When she wanted to signal or call someone Mrs. Shaver had an electric bell. She had it put in right after she had a stroke. She wasn't always able to ring it but Mrs. Shaver had a day bed outside the door close to her mother when she was not able to ring the bell. She always had spotless, immaculately clean linens."

■ Under the evidence found in this record, the only reasonable conclusion that can be arrived at is that prior to February 4, 1950, defendant knew his mother was making her home with the plaintiff and that shortly after that date he learned that his mother had had a stroke and was helpless and that his sister was providing her with a home, caring for and main-taining her. The jury were justified in finding that she had no financial means and was in need of help and care in consequence of an unavoidable cause and that about the middle of March 1950, plaintiff asked the de-fendant to share her maintenance and to contribute to her support and that he refused, although financially able to do so. Applying the provisions of our statute to these facts, we believe the jury was warranted in making the finding it did and that the verdict is not contrary to the law and evidence as contended by ap-pellant.

■ Appellant was called by appellee as an adverse witness and, after he had testified that he was the de-fendant and owned 212 acres of land in Lee county, his counsel objected to such testimony as being relevant or material. Counsel for appellee advised the court that the testimony was offered for the purpose of show-

ing that defendant was financially responsible. He was then asked regarding the extent of his personal property, and his counsel insist this was prejudicial error. Inasmuch as the duty to contribute to the support of a parent is dependent upon financial ability to do so, this evidence was material.

██ It is also insisted that the court erred in giving the jury improper instructions on behalf of appellee. The two instructions complained of embraced portions of the applicable provisions of the Public Assistance Code. It is also insisted that the court erred in refusing one instruction tendered by appellant. In the abstract of record furnished by counsel for appellant, two instructions given by the court on behalf of appellee and two instructions given by the court on behalf of appellant and one instruction tendered by appellant and refused by the court are set out, but no reference is made to any other instructions. The supplemental abstract of record furnished by appellee sets forth twelve given instructions prefaced by the statement that "The court marked certain instructions given and read same to the jury." It is not indicated at whose instance they were given, nor does it appear in either abstract whether or not all the instructions are contained in the abstracts. Under these conditions we are precluded from considering this assignment of error. (*Seeden v. Kolarik,* 350 Ill. App. 238.)

The judgment was warranted by the law and the evidence and is in accord with justice and equity.

*Judgment affirmed.*